**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

JNT CAPITAL, LLC,

      Plaintiff,

v.

AMAZON.COM SERVICES, LLC,

      Defendant.

_____/

Case No.: 24-cv-24090

## **Plaintiff's Motion for Preliminary Injunction**

*The greater the power, the more dangerous the abuse.*

—  Edmund Burke

This case is about the arbitrary and unjust actions of Amazon.com Services LLC ("Amazon"), which has single-handedly dismantled the business of JNT Capital LLC ("JNT"), a small but ambitious e-commerce company. Without warning or sufficient explanation, Amazon deactivated JNT's seller account, effectively cutting off JNT's access to its customers, inventory, and income. Despite repeated attempts by JNT to assess any potential problems or comply with Amazon's requests for verification, Amazon, leveraging unchecked power, not only refused to reinstate the account but also summarily disposed of more than $50,000 worth of JNT's merchandise. Amazon's actions are not just arbitrary; they are an abuse of its dominant market position, and an obliteration of a small business without accountability.

JNT's livelihood is at stake. Each day Amazon continues to block access to JNT's seller account, the company suffers irreparable damage to its reputation, goodwill, and business opportunities. Therefore, based on the declaration of JNT's owner and authorize representative,

Jon B. Pearson and the Declaration of Katherine Antonella Neira Galindo,[1]  JNT implores this Court to grant a preliminary injunction to immediately reinstate JNT's account, halt Amazon's wrongful practices, and preserve JNT's business while the merits of this case are being decided.

**Relevant Background**

*The facts contained herein are largely found in the Verified Complaint for Injunctive Relief and are recast here for the reader's convenience. [D.E. 1].*

## I.       JNT's Entrance into the E-Commerce Marketplace with Amazon.

1.       JNT is an ambitious participant in the rapidly growing e-commerce marketplace and seeks to capitalize on the opportunities provided by Amazon's vast customer base, lead generation, and fulfillment infrastructure. As part of this strategy, JNT established an Amazon store, intending to build a robust online retail operation that could serve customers nationwide and provide a steady stream of revenue.

2.       The Amazon store managed by EA on behalf of JNT grew quickly, benefiting from Amazon's fulfillment services and extensive customer reach.

3.       To manage its Amazon store, JNT partnered with Ecom Authority LLC ("EA"), a third-party management service in Miami, Florida. *See* Ex. 1 ¶ 3.

4.       EA is a member of Amazon's service provider network, which is a group of vetted third-party service providers who can help with almost every step of selling with Amazon. *See* Ex. 1 ¶ 4, Ex. 2 ¶ 6.

---

[1] A copy of the Jon B. Pearson Declaration (the "Pearson Declaration") and the declaration of Katherine Antonella Neira Galindo (the "Galindo Declaration") is attached hereto as **Exhibits 1 and 2**, respectively.

5.      Members on Amazon's service provider network, such as EA, meet a required set of standards, and they are qualified and trained on Amazon guidelines and policies. *See* Ex. 1 ¶ 5, Ex. 2 ¶ 7.

6.      Accordingly, as a member of Amazon's service provider network, EA provides comprehensive account management services, including inventory control, compliance with Amazon policies, and seller support communication to its customers, including JNT.  *See* Ex. 1 ¶ 6, Ex. 2 ¶ 8.

7.      Among the services offered by EA, it also provides product sourcing services for its customers. *See* Ex. 1 ¶ 7, Ex. 2 ¶ 9.

8.      In particular, JNT acquired several hundred Google Pixel phones from EA, as a trusted and vetted supplier and member of Amazon's service provider network. *See* Ex. 1 ¶ 8, Ex. 2 ¶ 10.

9.      Importantly, *before* EA was able to ship the purchased Google Pixel phones to JNT's account, Amazon required EA to submit five (5) serial numbers to verify the phones.  This is part of Amazon's transparency code program which is aimed at reducing counterfeit products from being sold on the Amazon platform.  Amazon does this on certain products to ensure that such products are valid and authentic before EA, among other vendors, can even ship to an Amazon fulfillment center. *See* Ex. 2 ¶ 11.

10.     With respect to the Google Pixel phones in JNT's account, EA sent Amazon the requested serial numbers and Amazon verified the phones through its transparency code program, otherwise EA would not have been able to ship the phones to an Amazon fulfillment center. *See* Ex. 2 ¶ 12.

11.     Once Amazon verified the serial numbers, EA shipped JNT's Google pixel phones to Amazon. *See* Ex. 1 ¶ 9, Ex. 2 ¶ 13.

12.     The entire purpose for the transparency code program is to provide assurance to Amazon that the products being sold on their platform are authentic and not counterfeit.  It also gives Amazon the ability to trace exactly where the products come from (the codes are from the manufacturer) in the event an issue arises. *See* Ex. 2 ¶ 14.

13.     However, despite this success and a lack of customer complaints, Amazon arbitrarily began the process of shutting down JNT's business, destroying its inventory, including the verified Google Pixel phones, locked JNT out of its seller bank account and caused irreparable harm and damage.

## II.     Amazon's Arbitrary Deactivation of JNT's Account and Destruction of its Inventory.

14.     On June 20, 2024, EA received a performance notification from Amazon concerning JNT's seller account, alleging issues with the authenticity of some of JNT's inventory, specifically the Google Pixel phones (the "Performance Notification"). This was the first time JNT ever encountered an authenticity problem with Amazon. *See* Ex. 1 ¶ 10, Ex. 2 ¶ 15.

15.     The Performance Notification indicated, among other things, that Amazon was questioning the authenticity of the JNT's Google Pixel phones in its inventory, despite the phones having been previously verified by Amazon through its transparency code program. *See* Ex. 1 ¶ 11, Ex. 2 ¶ 16.

16.     The Performance Notification also provided notice to JNT to appear for a scheduled video conference with an Amazon call center representative on June 27, 2024, concerning the issues identified therein. *See* Ex. 1 ¶ 12, Ex. 2 ¶ 17.

17.     Following this notification, EA began to coordinate with JNT to appear for the video conference and to obtain the documents requested by Amazon, including banking information, invoices, business organization and supply chain documents, among other documents. *See* Ex. 1 ¶ 13, Ex. 2 ¶ 18, 20.

18.     EA, also communicated with JNT's owner and authorized representative, Jon B. Pearson ("Pearson"), regarding the scheduled video conference and to advise that EA would assist in gathering all of the documents requested by Amazon. *See* Ex. 1 ¶ 13, Ex. 2 ¶ 19.

19.     On June 27, 2024, Pearson, on behalf of JNT, attended the video conference with a call center representative of Amazon which lasted less than 15 minutes. *See* Ex. 1 ¶ 14, Ex. 2 ¶ 21.

20.     The Amazon representative gave Pearson an email address to send all requested documents, and the conference ended abruptly without any discussion concerning the issues raised in the Performance Notification. *See* Ex. 1 ¶ 15.

21.     EA provided Pearson with documents responsive to Amazon's request, and as instructed, he submitted the documents to Amazon on multiple occasions, specifically, on June 28, July 10, July 17, July 26, and August 19, 2024. Amazon never confirmed receipt of the documents or acknowledged approval. *See* Ex. 1 ¶ 16, Ex. 2 ¶ 23.

22.     Despite JNT's previous submissions of the responsive documents, on July 4, 2024, EA received another notice from Amazon requesting, yet again, the same documents. It is a common practice with Amazon, where documents are requested multiple times without acknowledgment of receipt or approval. *See* Ex. 2 ¶ 24.

23.     Finally, on July 9, 2024, EA, on behalf of JNT, received a final notice providing that JNT's account had been deactivated due to alleged sale of unauthorized products, namely,

the Google Pixel phones JNT purchased from EA, an Amazon service provider network member. *See* Ex. 1 ¶ 17, Ex. 2 ¶ 25.

24.     Once an account is "deactivated," as in this case, JNT was unable to sell inventory or retrieve any of its products stored in Amazon's fulfillment centers. *See* Ex. 1 ¶ 18, Ex. 2 ¶ 26.

25.     Every Amazon seller like JNT, is required to maintain a bank account – to which Amazon has control and access – where sales disbursements are deposited and fees deducted. EA records also indicated that on July 4, 2024, Amazon froze JNT's seller account – which at the time consisted of approximately $14,000 – thereby preventing JNT access to such funds. *See* Ex. 1 ¶ 19, Ex. 2 ¶ 27.

26.     EA later discovered, sometime in October, that despite the June 20 Performance Notification and subsequent video conference and multiple document submissions and follow-ups by Pearson, on June 10, 2024 – ten (10) days *before* the Performance Notification – Amazon disposed of 129 out of 133 Google Pixel phones from JNT's inventory, allegedly due to authenticity concerns. *See* Ex. 1 ¶ 20, Ex. 2 ¶ 28.

27.     JNT paid more than $50,000 for the phones disposed of by Amazon. *See* Ex. 1 ¶ 20.

28.     These were the same Google Pixel phones that Amazon verified through its transparency code program before authorizing JNT – an Amazon service provider network member – to ship the phone to Amazon. *See* Ex. 1 ¶ 21, Ex. 2 ¶ 29.

29.     Despite this, Amazon disposed of JNT's Google Pixel phones, some of which were stored in Amazon's Miami fulfillment center, without giving JNT any opportunity, let alone a fair opportunity to demonstrate compliance. *See* Ex. 2 ¶ 30.

30.     Amazon also disposed of or destroyed other products in JNT's account, in addition to the phones, including various consumer products stored at multiple Amazon fulfillment centers, including:

- Fruitables (1,244 units) valued at $4,602.
- Pines Glo (63 units) valued at $220.
- Little Free products totaling $102.
- Dial Soap (14 units) valued at $65.
- Star Wars Merchandise (169 units) valued at $4,732.
- Midea (23 units) valued at $4,117.

*See* Ex. 1 ¶ 22, Ex. 2 ¶ 31.

31.     The total value of the disposed or seized inventory, including the Google Pixel phones, exceeds $119,000.00, causing substantial harm and loss of good will to JNT. *See* Ex. 1 ¶ 22.

32.     In mid-September, EA, on behalf of JNT, received an FBA (Fulfillment by Amazon) inventory notice, providing that Amazon will destroy JNT's inventory in thirty (30) days. *See* Ex. 1 ¶ 23, Ex. 2 ¶ 32.

33.     Subsequent notices providing fifteen (15) and (5) day notice to JNT of Amazon's impending destruction of JNT inventory were received by EA on September 30, 2024 and October 10, 2024, respectively. *See* Ex. 1 ¶ 24, Ex. 2 ¶ 33.

34.     If no action is taken, eventually all JNT's inventory stored with Amazon will be disposed of or destroyed. *See* Ex. 1 ¶ 25, Ex. 2 ¶ 34.

35.     In the meantime, Amazon has been charging JNT's seller account – which it has been lock out of since July 9, 2024 – service fees (which are in reality are inventory disposal fees), and inventory storage fees.  *See* Ex. 1 ¶ 26, Ex. 2 ¶ 35.

36.     Despite JNT's repeated efforts to cooperate and resolve the matter, Amazon has provided no clear explanation for the account deactivation or inventory disposal. *See* Ex. 1 ¶ 27.

37.     JNT complied with all of Amazon's requests for documentation and verification, yet Amazon continued to take arbitrary actions causing irreparable harm to JNT.  *See* Ex. 1 ¶ 28.

38.     JNT is unable to conduct business, fulfill orders, or maintain its relationships with customers, which has resulted in significant reputational damage and a loss of goodwill. *See* Ex. 1 ¶ 29.

39.     The financial impact of Amazon's actions is severe. JNT invested significant resources into building its business on Amazon's platform, including paying $45,000 to EA for the setup and management of its store. The deactivation of JNT's account and disposal of inventory have rendered this investment effectively worthless nor has Amazon compensated JNT for the value of the phones already destroyed by Amazon for which JNT paid more than $50,000. *See* Ex. 1 ¶ 30.

40.     The inability to fulfill customer orders has not only resulted in lost sales but has also damaged JNT's reputation with its customers. Many of JNT's customers relied on timely delivery of products, and Amazon's actions have prevented JNT from fulfilling its obligations, leading to a loss of customer trust and goodwill. *See* Ex. 1 ¶ 31.

41.     Each day that passes without access to the Amazon account results in further irreparable harm to JNT's business. The loss of revenue, business opportunities, and customer relationships continues to compound, leaving JNT with no means of recovery without immediate court intervention. *See* Ex. 1 ¶ 32.

**III.    Congress Has Taken Notice of Amazon's Flawed and Automated Procedures.**

42.     Amazon's actions in this case reflect an overly broad and arbitrary approach to compliance, ostensibly in response to the INFORM Consumers Act (the "Act").

43.     Upon information and belief, JNT believes that in its effort to enforce compliance with the Act, Amazon appears to have implemented unrefined controls, likely through the use of A.I technology, that fail to distinguish between legitimate sellers like JNT and those who are genuinely engaged in fraudulent conduct. This indiscriminate approach throws the baby out with the bathwater, and has devastated JNT's an other's businesses, causing irreparable harm through the loss of inventory, revenue, and market opportunities.

44.     In short, the issues faced by JNT are not isolated; they are part of a broader pattern of arbitrary actions by Amazon that have drawn significant criticism from government representatives.

45.     Members of Congress, including Congressman Christopher Smith, have expressed concern over Amazon's unfair enforcement practices, which have negatively affected numerous small businesses across the country.

46.     Congressman Smith, in his letter, specifically highlights Amazon's arbitrary actions in suspending seller accounts and seizing inventory without providing adequate justification or due process. The letter underscores the lack of transparency and accountability in Amazon's decision-making processes, and calls into question the platform's compliance measures, which, like here, often punish legitimate sellers while ostensibly attempting to curb fraudulent activity.

47.     The letter from Congressman Smith reflects mounting frustration over Amazon's unwillingness to distinguish between compliant sellers and those acting in bad faith, and it advocates for reforms that would protect small businesses from unwarranted penalties. A copy of Congressman Smith's letter is attached hereto as **Exhibit 3**.

9

48.     Despite full cooperation by JNT and EA in providing documentation, fulfilling verification requests, and demonstrating the legitimacy of JNT's products, Amazon has persisted in denying reactivation of JNT's account and has unlawfully disposed of or seized its inventory, without any compensation therefor. This lawsuit seeks to put an end to Amazon's wrongful actions and to obtain compensation for the substantial losses inflicted on JNT's business.

**Applicable Standard**

District courts are given wide latitude when ruling on a motion for preliminary injunction, and orders granting or denying a preliminary injunction are reviewed only for abuse of discretion. *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). "Preliminary injunction motions are often, by necessity, litigated on an undeveloped record. But an undeveloped record not only makes it harder for a plaintiff to meet his burden of proof, it also cautions against an appellate court setting aside the district court's exercise of its discretion." *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000).

**Argument**

A preliminary injunction is a critical tool used to maintain the status quo and preserve the district court's power to render a meaningful decision after a trial on the merits. *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cty. Fla.*, No. 20-CV-21084-SCOLA/TORRES, 2020 U.S. Dist. LEXIS 175990, at *11 (S.D. Fla. Sep. 23, 2020) (quotations and citations omitted). Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits. *Id.*

To obtain a preliminary injunction, a movant must satisfy four elements: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) that

the balance of equities favors the movant; and (4) that the public interest would not be adversely affected by the issuance of the injunction. *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001). The movant is not required to prove its case in full at this stage, but rather must present enough evidence, the burden of persuasion, to warrant the extraordinary remedy of injunctive relief. *See Siegel*, 234 F.3d 1163 at 1176.

1. <u>First Element</u>: **JNT is Likely to Succeed on the Merits its Breach of Contract, Unjust Enrichment, and Conversion Claims**

To establish a substantial likelihood of success on the merits, a plaintiff must demonstrate a likelihood of success at trial for its *prima facie* case. *Chabad Chayil, Inc.*, No. 20-CV-21084-SCOLA/TORRES, 2020 U.S. Dist. LEXIS 175990, at *12 (citing *TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1325 (S.D. Fla. 2015). "When plaintiffs assert multiple claims as a basis for a preliminary injunction, they 'need only establish a substantial likelihood of success on one claim.'" *Boggs Contracting, Inc. v. Freismuth*, No. 6:21-cv-2088- CEM-EJK, 2021 U.S. Dist. LEXIS 252335, at *5 (M.D. Fla. Dec. 27, 2021) (citing and quoting *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, (M.D. Fla. 2020) (other citations omitted).

A. *Breach of Contract*

JNT is likely to succeed on its breach of contract claim. To prevail on a breach of contract claim under Florida law, a plaintiff must establish: (1) the existence of a valid contract, (2) a material breach of that contract, and (3) damages resulting from the breach. *Renia v. Curtis Protective Servs.*, No. 6:19-cv-1724-CEM-DCI, 2022 U.S. Dist. LEXIS 93557, at *14 (M.D. Fla. Mar. 7, 2022) (citations omitted). Here, a valid contract exists between JNT and Amazon, specifically the Amazon Business Solutions Agreement (the Agreement"), a copy of which is

attached hereto as **Exhibit 4.** Under Section 3 of this Agreement, Amazon may only terminate or suspend JNT's account without notice under specific conditions.

> We may suspend or terminate your account or this Agreement immediately if we determine that (a) you have materially breached the Agreement and failed to cure within 7 days of a cure notice unless your breach exposes us to liability toward a third party, in which case we are entitled to reduce, or waive, the aforementioned cure period at our reasonable discretion; (b) your account has been, or our controls identify that it may be used for deceptive or fraudulent, or illegal activity; (c) your use of the Services has harmed, or our controls identify that it might harm, other sellers, customers, or Amazon's legitimate interests; (d) your Account Health Rating falls below our published threshold(s) for deactivation; or (e) if we are required to do so by law.

Agreement, § 3.

Amazon's actions constitute a material breach of the Agreement. The Agreement clearly specifies that Amazon may only suspend or terminate JNT's account without notice if one of several enumerated conditions is met. Amazon's deactivation does not fall under any of these conditions. JNT has not materially breached the Agreement, nor has Amazon provided any notice of a breach or opportunity to cure as required under the contract. No credible evidence other than self-serving statements by Amazon exists for the proposition that JNT's account was involved in any deceptive, fraudulent, or illegal activity, or that JNT's use of Amazon's services harmed other sellers, customers, or Amazon's legitimate interests.

In fact, JNT fully complied with Amazon's requests for verification, providing all necessary documentation in a timely and transparent manner. *See* Ex. 1 ¶ 16, Ex. 2, ¶ 22-23. Amazon's failure to provide proper notice, allow JNT to cure any alleged issues, or present any legitimate reason for the termination violates Section 3 of the Agreement. This arbitrary and unjustified deactivation is a material breach because it deprives JNT of the essential benefits of the contract, namely the ability to use Amazon's platform to conduct its business.

As a direct result of Amazon's material breach, JNT has suffered substantial damages, including: (a) the loss of over $50,000 worth of inventory, which Amazon wrongfully disposed of after the account deactivation; (b) the loss of business opportunities and the ability to generate revenue, as JNT is unable to access its seller account to fulfill orders and operate its business; (c) reputational harm, as JNT's inability to fulfill customer orders has damaged its relationships with customers and led to a loss of goodwill; and (d) the freezing of approximately $9,786.88 in sales proceeds, which Amazon continues to withhold despite JNT's compliance with its verification process.

Amazon's failure to adhere to the termination procedures required by the Agreement, combined with the significant damages incurred by JNT, demonstrates that Amazon has materially breached the Agreement. As such, JNT is likely to prevail on its breach of contract claim.

B.  *Unjust Enrichment*

JNT is also likely to succeed on its unjust enrichment claim if a valid contract is found not to exist. Under Florida law, "[t]o bring an unjust enrichment claim, a plaintiff must allege that: (1) plaintiff conferred a benefit on the defendant; (2) defendant voluntarily accepted and retained the benefit; and (3) it would be inequitable for defendant to retain the benefit without paying the value of the benefit to plaintiff." *Johnson v. Catamaran Health Sols., LLC*, 687 F. App'x 825, 830 (11th Cir. 2017) (citing *Fito v. Attorneys' Title Ins. Fund, Inc*., 83 So. 3d 755, 758 (Fla. 3d DCA 2011)).

**First**, JNT conferred a benefit on Amazon by selling legitimate inventory through Amazon's platform. In return for this service, Amazon collected service fees, and JNT provided Amazon with valuable inventory for sale. Additionally, JNT has approximately $9,786.88 in

frozen sales proceeds in Amazon's possession, representing the sales generated through Amazon's marketplace.

**Second**, Amazon voluntarily accepted and retained these benefits. Amazon not only retained the sales proceeds from JNT's transactions but also took control of JNT's inventory worth over $50,000, which it later disposed of without justification. Amazon accepted the benefit of JNT's goods and retained the funds generated from those sales, refusing to disburse them back to JNT despite JNT's compliance with its verification processes.

**Third**, it would be inequitable for Amazon to retain these benefits without compensating JNT. Amazon wrongfully deactivated JNT's seller account, withheld funds owed to JNT, and disposed of valuable inventory. Allowing Amazon to retain both the sales proceeds and the value of JNT's inventory without payment is fundamentally unjust, particularly given JNT's full compliance with Amazon's verification requests and the lack of any legitimate justification for Amazon's actions. Amazon's retention of these benefits under these circumstances would be inequitable and against the principles of fairness that underlie claims of unjust enrichment.

### C.  Conversion

JNT is also likely to succeed on its conversion claim if no contract is found to exist. "'Under Florida law, the elements of conversion are "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein."'" *Marcolino v. Sweet Home Mobile Home LLC*, No. 20-61797-CIV, 2021 U.S. Dist. LEXIS 100555, at *9 (S.D. Fla. May 27, 2021) (quoting *TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1299 (S.D. Fla. 2016) (quoting *Joe Hand Promotions, Inc. v. Creative Enter.,* LLC, 978 F.Supp.2d 1236, 1241 (M.D.Fla.2013)) (internal quotations omitted).

**First**, Amazon wrongfully asserted dominion over JNT's property. JNT provided over $50,000 worth of legitimate inventory to Amazon for sale through its platform. Amazon wrongfully deactivated JNT's seller account and, without any justification, disposed of JNT's valuable inventory. This action demonstrates that Amazon wrongfully asserted control over JNT's goods, exercising dominion over them in a manner inconsistent with JNT's rights.

**Second**, Amazon's actions were an act of dominion over JNT's property. The inventory at issue was owned by JNT and lawfully placed on Amazon's platform for sale. Amazon's unilateral decision to deactivate the account and dispose of the inventory deprived JNT of its ownership rights to the property. Additionally, Amazon has withheld approximately $9,786.88 in sales proceeds that rightfully belong to JNT, further demonstrating Amazon's exercise of control over JNT's property.

**Third**, Amazon's actions were inconsistent with JNT's ownership rights. By disposing of JNT's inventory and withholding funds, Amazon engaged in conduct that was wholly inconsistent with JNT's ownership of the property. JNT had every right to retain ownership of its inventory and to receive the sales proceeds for products sold on Amazon's platform. Amazon's actions deprived JNT of both, thereby satisfying the elements of conversion.

Amazon's disposal of JNT's inventory and wrongful retention of sales proceeds constitute a clear exercise of dominion over JNT's property that is inconsistent with JNT's ownership rights. As a result, JNT is likely to succeed on its conversion claim.

2.     <u>**Second Element**</u>: **JNT will Suffer Irreparable Harm if an Injunction is not Granted**

The harm to JNT is not just financial—it is existential. Without this Court's intervention, JNT's business will be effectively dismantled by Amazon's actions, leading to damage that no monetary remedy can ever truly address. In order to obtain the equitable remedy of an injunction,

a plaintiff must establish that they will suffer irreparable harm, i.e., that there is no adequate remedy at law. *See Reynolds v. Roberts*, 207 F.3d 1288, 1299 (11th Cir. 2000) ("A court enters a preliminary injunction to prevent the plaintiff from being injured, and where there is no adequate remedy at law") (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)).

JNT will suffer irreparable harm if Amazon is not enjoined from its unlawful actions. *See* Ex. 1 ¶ 28-34. ***First***, the ongoing damage to JNT's reputation and goodwill cannot be adequately compensated by monetary damages. As an e-commerce business that relies on customer trust and its presence on Amazon's platform, JNT's ability to fulfill orders and maintain its relationships with customers is critical to its continued success. *Id.* The deactivation of its account and the wrongful disposal of its inventory have caused substantial harm to JNT's reputation, and each day that the account remains inactive worsens this harm. *Id.* Courts routinely recognize that loss of goodwill and damage to reputation constitute irreparable harm because they are difficult to quantify and cannot be remedied through monetary compensation alone.

This Court has held that "'[t]he loss of customers and goodwill is an "irreparable" injury.'"" *Fortiline, Inc. v. Moody*, No. 12-CV-81271-RYSKAMP, 2013 U.S. Dist. LEXIS 200015, at *14 (S.D. Fla. Jan. 3, 2013) (quoting *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)); *Mainsail Parent, LLC v. Jewell*, No. 24-22875-CIV-ALTONAGA/Reid, 2024 U.S. Dist. LEXIS 152480, at *11 (S.D. Fla. Aug. 26, 2024) ("In any event, even without the presumption, Plaintiffs have shown irreparable harm. '[T]he loss of . . . goodwill is an irreparable injury.'") (quoting *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 780 (11th Cir. 2015)). "The reason being is that the resulting damages are not easily quantifiable in money terms[.]" *Fortiline,* LEXIS 200015 at *14 (internal quotations omitted).

**Additionally**, the loss of JNT's business opportunities is irreparable. *See* Ex. 1 ¶ 28-34. JNT's inability to access its seller account or process customer orders has brought its business operations to a halt, depriving it of sales opportunities and long-term growth.

> Regarding irreparable harm, this 'inquiry seeks to measure harms that no damages payment, however great, could address.' *Celsis In Vitro, Inc. v. Cellzdirect, Inc*., 664 F.3d 922, 930 (Fed. Cir. 2012). '*Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.*' *Id*.

*Socket Sols., LLC v. Imp. Glob., LLC*, No. 1:23-cv-24517-DSL, 2024 U.S. Dist. LEXIS 162489, at *29 (S.D. Fla. Sep. 9, 2024); *ECapital Commer. Fin. Corp. v. Hitachi Cap. Am. Corp*., 519 F. Supp. 3d 1129, 1136 (S.D. Fla. 2021) ("Grounds for irreparable injury include loss of control of *reputation, loss of trade, and loss of goodwill*") (internal citation omitted).

3.    <u>Third Element</u>: The Threatened Injury to Amazon does not Outweigh the Damage an Injunction may Case

The balance of equities in this case overwhelmingly favors JNT. In deciding whether to grant a preliminary injunction, courts must weigh the respective harms that the nonmovant will suffer from the issuance of the injunction. *See Davidoff & Cie, S.A. v. PLD Int'l Corp*., 263 F.3d 1297, 1304 (11th Cir. 2001).

In this case, JNT faces significant and irreparable harm if Amazon's unlawful actions are allowed to continue, while the harm to Amazon from an injunction would be minimal at best. *See* Ex. 1 ¶ 28-34.  JNT stands to suffer devastating harm if the injunction is not granted. *Id*. As detailed above, JNT's business has been brought to a standstill due to Amazon's wrongful deactivation of its account and disposal of its inventory. *Id*. Without access to its seller account, JNT is unable to fulfill orders, generate revenue, or maintain relationships with customers. In

short, JNT's business will die if an injunction is not entered, and as explained above, these harms cannot be remedied through monetary compensation alone.

On the other hand, Amazon faces minimal, if any, harm if the injunction is granted. Reinstating JNT's account and halting Amazon's unlawful actions would simply require Amazon to follow the contractual procedures to which it is already obligated to adhere. Amazon is a multi-billion-dollar company with vast resources, and the temporary reinstatement of JNT's account poses no significant threat, if any, to its operations, reputation, or financial stability. In fact, Amazon's interest in enforcing its platform policies can still be maintained while this litigation proceeds, as JNT has already demonstrated its willingness to comply with Amazon's requests and verification procedures.

The equities in this case tilt heavily in favor of JNT with no damage inuring to Amazon upon the injunction being granted. JNT is a small business whose *survival is at stake*, whereas Amazon's interests are largely financial and can be addressed in the ordinary course of litigation. Given the stark difference in the harms faced by the parties, the balance of equities strongly favors granting the injunction to prevent further irreparable harm to JNT.

4. **<u>Fourth Element</u>: Granting the Injunction is not Against Public Policy**

Far from being adverse to the public interest, granting this injunction directly serves it. Courts must ensure that a preliminary injunction is not adverse to the public interest. *Sapphire Consulting Servs. LLC v. Anderson*, No. 6:20-cv-1724-CEM-LRH, 2021 U.S. Dist. LEXIS 54101, at *15 (M.D. Fla. Feb. 12, 2021) ("If issued, a preliminary injunction must not be adverse to the public interest"). Far from harming the public interest, this injunction will restore and preserve fairness and protect small businesses.

The public has a strong interest in seeing that contracts are honored, particularly when large platforms like Amazon are involved. By holding Amazon accountable to its own Agreement, this Court will reinforce the principle that even the most powerful companies must abide by their contractual obligations. *See Winmark Corp. v. Brenoby Sports, Inc*., 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014) (holding enforcement of contract an interest in favor of public policy). When a dominant company like Amazon takes unilateral action that threatens to dismantle a small business, it disrupts fair competition and harms the broader public interest in maintaining a competitive and balanced marketplace.

Reinstating JNT's account and requiring Amazon to adhere to its contractual obligations imposes no negative impact on the public or on Amazon. On the contrary, it would preserve the integrity of the marketplace and ensure that all businesses, regardless of size, are treated fairly. Thus, the public interest is best served by preventing arbitrary actions that could unfairly harm small businesses like JNT.

## 5.      No Bond Should Be Required

Federal Rule of Civil Procedure 65(c) states, *inter alia*, that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Sapphire Consulting Servs. LLC v. Anderson*, No. 6:20-cv-1724-CEM-LRH, 2021 U.S. Dist. LEXIS 54101, at *16 (M.D. Fla. Feb. 12, 2021) (quoting Rule 65(c)). However, "it is well-established that the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all." *Id.* (quoting *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Ltd. Liab. Co.*, 425 F.3d 964, 971 (11th Cir. 2005) (citation and internal quotations omitted).  In fact, "[a] bond

may not be required, or may be minimal, when the harm to the enjoined party is slight."" *Id.* (quoting *Lepper v. Franks*, No. 5:18-cv-644-Oc-41PRL, 2019 U.S. Dist. LEXIS 5468, at *7 (M.D. Fla. Jan. 11, 2019); *Tancogne v. Tomjai Enters. Corp.*, 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005).

In this case, the harm to Amazon from reinstating JNT's seller account is negligible, if not non-existent. Amazon, one of the largest companies in the world, will suffer little to no financial impact from complying with this injunction. Its massive resources will remain intact, and its shareholders – already among the richest individuals in the word – will continue to enjoy their immense wealth. Simply put, allowing JNT to regain access to its account during litigation is a minor inconvenience for Amazon, if felt at all, but a lifeline for JNT.

### Conclusion

JNT has established that it is entitled to a preliminary injunction. It has demonstrated a strong likelihood of success on the merits and that it faces irreparable harm if Amazon's actions are not immediately halted. Each day JNT remains locked out of its seller account, its reputation, customer relationships, and business opportunities suffer irreversibly. The balance of equities overwhelmingly favors JNT, as Amazon, a global giant, would suffer minimal harm from reinstating JNT's account.

This Court's intervention is critical to prevent further destruction of JNT's business. JNT respectfully requests that the Court issue the preliminary injunction, reinstate its seller account, and impose either a nominal bond or none at all, given the minimal harm to Amazon and the devastating impact on JNT if relief is denied.

WHEREFORE, JNT respectfully requests that this Court grant its Motion for Preliminary Injunction, order Amazon to immediately reinstate JNT's seller account and cease any actions

that would further harm JNT's business operations, reputation, and goodwill, require Amazon to preserve and protect JNT's sales proceeds and inventory, refrain from disposing of any remaining assets related to JNT's account, impose a nominal bond or no bond at all given the minimal harm to Amazon and the severe irreparable harm JNT faces without relief, and grant such further relief as this Court deems just and proper.

Dated: October 23, 2024.

Respectfully Submitted,

*/s/ Paul D. Turner*
Paul D. Turner, Esq. (FBN 113743)
pturner@pbyalaw.com
Ricardo A. Arce, Esq. (FBN 76201)
rarce@pbyalaw.com
David M. Robbins, Esq. (FBN 1012340)
drobbins@pbyalaw.com

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
283 Catalonia Ave, Suite 200
Coral Gables, FL 33134
T: (305) 377-0086 / F: (305) 377-0781
*Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Paul D. Turner*
Paul D. Turner, Esq. (FBN 113743)